UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PAYLESS SHOESOURCE, INC., a Missouri corporation,<br><br>     Plaintiff,<br><br>  v.<br><br>DIANA JOYE, as Trustee of The Dena Trust, THE DENA TRUST,  a California trust,<br><br>     Defendants. | No.  2:12-cv-00517-MCE-DAD<br><br><br>**MEMORANDUM AND ORDER** |

   Through the present motion, Plaintiff Payless Shoesource, Inc. ("Plaintiff" or

"Payless") seeks to recoup alleged overcharges imposed by its landlord  for common

area maintenance ("CAM"), taxes and insurance for the Yuba City, California, facility

Payless leases from Defendant The Dena Trust.  Jurisdiction is premised on diversity of

citizenship pursuant to 28 U.S.C. § 1332(a).  Defendants Diana Joye, as Trustee of the

Trust, together with the Trust itself (hereinafter collectively "Defendants" unless

otherwise noted) now move for summary judgment, or alternatively for partial summary

judgment pursuant to Federal Rule of Civil Procedure 56.

///

///

1

1  Defendants assert that both claims asserted by Plaintiff, for breach of contract and for

2  declaratory relief, respectively, are foreclosed by that parties' lengthy course of conduct

3  in calculating amounts due under the lease agreement.  Plaintiff, on the other hand,

4  alleges that the fees at issue impermissibly fail to comply with the formula set forth in the

5  lease agreement itself.  For the reasons set forth below, summary judgment is granted in

6  Defendants' favor.

7

8                                     **BACKGROUND**

9

10         This action arise from a lease agreement ( the "Lease") entered into on July 1,

11  1987, between Payless' predecessor-in-interest, the Volume Shoe Corporation, under

12  the terms of which Volume agreed to lease 3,580 square feet of retail space at the Sutter

13  Crossroads Shopping Center in Yuba City, California (the "Development").  The

14  shopping center has a total of eight commercial buildings on seven separate parcels with

15  a total gross leasable floor area of some 114,679 square feet.  (Defs.' Undisputed Fact

16  ("DUF") No. 4.  In accordance with the 1987 lease, as subsequently extended, Payless

17  currently occupies 3,580 square feet within the Development's building located at

18  1222 Colusa Avenue.  That building contains a total of 13,300 square feet.  Id. at

19  Nos. 5-7.  Beginning in approximately 1994, separate parcels of the shopping center

20  development, which previously had been under common ownership, were sold

21  separately.  In 1995, Defendants purchased Parcels 1 and 2 of the development, which

22  included the building at 1222 Colusa occupied by Payless ("1222 Building"), from Voit

23  Yuba Partners.  Id. at No. 6-7, 26.

24         In addition to base rent, the Lease requires Payless to pay a pro rata share of

25  CAM costs, as well as a similar proportionate share of taxes and insurance.

26  ///

27  ///

28  ///

                                            2

1  The Lease specifies that these expenses, collectively referred to as "pass-through

2  charges," are to be paid in accordance with the "ratio of the total floor area of the

3  Demised Premises [the leased parcel] to the gross leasable floor area of completed

4  buildings within the Development from time to time."  Lease, Exhibit 1, § 7.02 (CAM

5  expenses); § 9.02 (taxes); § 10.05 (insurance).[1]  The term "Development" is defined as

6  "a planned, organized, and integrated group of retail facilities owned and managed by

7  Landlord."  DUF No. 13 (emphasis added).  Therefore, under the terms of the lease,

8  Payless' pro rata share of pass-through charges was to be 3,580 (the total square

9  footage occupied by Payless) divided by 114,679 (the total gross leasable floor area

10  within the Development), which equates to a 3.12 percent share of the total pass-

11  through charges incurred by all parcels within the Development (the "Lease Formula").

12  DUF No. 14.  Clearly, in delineating that formula, the Lease Formula assumed that a

13  common Landlord would be "owning and managing" the Development on an "integrated"

14  basis.  Once individual parcels of the Development began to be sold in 1994, that no

15  longer was the case.

16      Following the Dena Trust's purchase of the Parcels containing the 1222 Building

17  in 1995, the seller, Voit, continued to manage the property on the Trust's behalf.  Decl. of

18  Diana Joye, ¶ 5.  Defendant Diana Joye, as Trustee for the Dena Trust, however,

19  subsequently assumed management responsibilities from Voit in March of 1998.  DUF

20  No. 36.   Joye states that Voit provided her with training and instruction with regard to

21  pertinent management responsibilities.  That training and instruction included how to

22  allocate pass-through charges to Payless and other tenants, as well as the specific items

23  of expense to be included within those charges.  Id. at ¶ 8.

24      According to Diana Joye, she was instructed to allocate expense into three

25  separate categories in a manner referred to by Defendants as the "Revised Formula).

26

27  _____

[1] Numbered exhibits are referred to in this Memorandum and Order as exhibits offered by
Defendants; Plaintiff's exhibits are in alphabetical order and will be referred to as such.  No party has
argued that the exhibits presented through this Motion have not been properly authenticated and therefore
the authenticating source for each exhibit is not necessary to recount herein.

28

First, any expenses incurred by the property management but unique to a specific tenant (like a dedicated HVAC system) were allocated 100 percent to that tenant.  Second, any CAM expenses incurred for the benefit of all parcels within the Development would be allocated to each parcel in proportion to its respective size within the Development (items under this category would include landscaping, exterior lighting and parking lot repairs).  Using just the 1222 Building as a benchmark (since the Development was no longer unitarily owned), its share of such CAM expense was 11.4 percent of the entire Development.  Then, because Payless occupies 26.92 percent of the 1222 Building's 13,300 leasable square footage, Payless is responsible for 26.92 percent of the Buildings overall percent of CAM charges.  This calculation equates to a total expense responsibility for CAM charges of 3.068 percent on Payless' part, which is actually slightly less than the 3.12 percent called for in the Lease Formula as described above. Id.  Joye further states that she has been using this lower rate for CAM charges since the time of the 1997 annual reconciliation, which she prepared shortly after assuming management responsibilities in early 1998.  Id.

The third and final category expenses are those specific to a particular parcel as opposed to the entire Development.  Those expenses, which included items like property taxes and insurance, were allocated under the Revised Formula to the tenants of a particular building in proportion to that tenant's percentage of the building's total occupancy.  Again, in Payless' case, since it occupied 26.92 percent of the 1222 Building's total leasable square footage, 26.92 percent of such expenses would be payable by Payless.  Id.

Diana Joye maintains that ever since Lease year 1997, and continuing to Lease year 2010, she has consistently applied this three-pronged Revised Formula with regard to the three foregoing categories of pass-through charges.  Id. at ¶ 8,  In addition, because she indicates she was trained on how to allocate the various expenses by Voit, Joye believes that the revised formula was used since the initial sale of the 1222 Building by the overall Development in 1994.

4

1    This would make sense since the taxes and insurance component of pass-through

2    charges could not realistically be calculated based on the Development as a whole once

3    the Development was split into separately owned parcels.[2]

4         The Lease contains an annual reconciliation provision requiring that the Landlord

5    provide an annual accounting of CAM charges not later than 30 days following the end

6    of each lease year.  The lease states:

7              Within thirty (30) days following the end of each Lease Year,
               Landlord shall submit an invoice together with supporting
8              data, prepared in accordance with generally accepted
               accounting practices, which shall show in clear and sufficient
9              detail (i) all costs paid attributable to Common Area
               maintenance as hereinabove defined…..
10

11   Lease, Ex. 2, § 7.02

12        The lease goes on to provide that CAM charges shall be reconciled against the

13   annual statement, with "any difference [to] be paid by the respective party promptly."  Id.

14   at § 7.03.  Finally, the Lease calls for reimbursement to the Landlord of pro rata charges

15   for taxes and insurance "on demand" in accordance with §§ 9.02 and 10.05.  In the

16   event the Landlord fails to submit an annual statement detailing all claimed pass-through

17   charges within 90- days following the end of a lease year, the Lease allows Payless to

18   withhold payments for CAM charges until such statement has been submitted and

19   approved.  Id. at § 7.04.

20        Although all three categories of pass-through charges were assessed by

21   calculating Payless' pro rata share of the building it occupied (under the Revised

22   Formula) rather than its pro rata share of the entire Development (in accordance with the

23   Lease Formula) between the time the 1222 Building was initially sold in 1994 and 2010,

24   the present 2012 lawsuit argues that the Lease Formula should have been faithfully

25   followed during that entire period.

26   ///

27        [2] In addition to Parcels 1 and 2 purchased by Defendant Trust in 1995, the Development also sold
     other Parcels beginning in 1994, including Parcel 5 to Red Robin International in 1994, Parcel 4 to Robert
28   S. Rouse and Phyllis Rouse in 1995, and Parcel 6 to Jeff Wu  in 1996.  DUF Nos. 23-26.

1    In now moving for summary judgment, Defendants point to the conduct of the parties,

2    particularly with respect to the annual accounting of the charges without substantial

3    objection over a period of nearly 15 years, as precluding Payless from now arguing that

4    lease provisions should apply despite the parties' long practice of reconciling pass-

5    through expenses otherwise.

6         On March 5, 1996, while Voit was still managing the 1222 Building, it sent a letter

7    to Payless explaining that Payless was being charged 26.92 percent for expenses

8    "shared only with the other tenants in your building, i.e., property taxes and insurance."

9    DUF No. 55.  Attached to the letter was both a reconciliation statement for the 1995

10   leasehold year, as well as a proposed budget for 1996.  It is undisputed that both those

11   statements reflected the three different pass-through expense percentages as

12   represented by the Revised Formula.  Id. at 55-57.   Although Payless' lease

13   administrator questioned several aspects of both the reconciliation and proposed

14   budget, and although additional information was provided, there is no evidence that use

15   of the Revised Formula was itself disputed.  The reconciliation statement was

16   subsequently approved.  See Ex. 5.

17        Even more significant is the fact that later in 1996 Payless issued an Estoppel

18   Certificate representing that there were no outstanding breaches of the lease despite the

19   fact that the Revised Formula had been clearly disclosed as stated above.  The

20   Certificate, executed by Payless on December 10, 1996, before Defendants conveyed

21   an interest in the 1222 Building to the Martha L. Hartrick Trust, attests in pertinent part

22   as follows:

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

6

1        As of this date, to the best of Tenant's knowledge, there are
2    no defaults or breaches under the lease…..

3        The statements contained herein are not affirmative
     representations, warranties, covenants or waivers, but shall
4    act solely to estop the undersigned from asserting any claim
     or defense against Voit Yuba Partners, Ltd. and Dena Trust &
5    Martha L. Hartrick Trust, to the extent such claim or assertion
     is based upon facts now known to the undersigned which are
6    contrary to those contained herein, and Voit Yuba Partners,
     Ltd. and Dena Trust & Martha L. Hartrick Trust, for fair value,
7    has acted in reasonable reliance upon such statements
     without knowledge of facts to the contrary.

8

9    Estoppel Certificate, Ex. 10.

10       While Payless does not dispute the representations made by way of the Estoppel

11   Certificate, or Defendants' contention that the Revised Formula had been used ever

12   since the 1222 Building came under individual ownership in 1994, it nonetheless asserts

13   that the Certificate cannot be used on a prospective basis with respect to the parties'

14   conduct after it was issued.  Examination of the parties' conduct subsequent to issuance

15   of the Estoppel Certificate, however, shows unequivocally that the Revised Formula was

16   used without objection by Payless between 1997 and 2010.

17       On February 18, 1997, after an inquiry from Payless with respect to the

18   reconciliation statement for 1996 and the proposed budget for 1997, Voit reiterated its

19   application of the Revised Formula, stating as follows:  "Since this building has been

20   separately owned in 1994, you have been charged 26.92 % of the property tax bill and

21   other expenses pertinent to this building only…."  Ex. 15.

22       On March 9, 1998, after Diana Joye took over management of the lease, she sent

23   both a 1997 Reconciliation Statement and a 1998 Budget to Payless.  Those statements

24   clearly use the 26.92 percent calculation used by the Revised Formula.  See Ex. 13. The

25   only difference between Joye's accounting, and the previous system utilized by Voit, was

26   that the CAM expenses were computed based on the basis of Payless' ratio to the 1222

27   Building's total leasable space in the same way that taxes and insurance were

28   calculated.

As stated above, this resulted in a lower cost than the 3.12 percent that had been envisioned by the Lease itself, since the Revised Formula ratio actually results in a slightly lower 3.068 percent with respect to the Development costs as a whole. Thereafter, similar reconciliation and budget statements were prepared for 1998-1999, 1999-2000, 2000-01, 2001-02, 2002-03, 2003-04, 2004-05, 2005-06, 2007-08, 2008-09 and 2009-10, as well as a reconciliation statement for 2010.  All reflected use of the Revised Formula for pass-through charges.  See Ex.13.  Significantly, according to Diana Joye, during this entire period, Payless has never objected to use of the Revised Formula in making a payment or taking a credit under any of these reconciliations.  Joye Decl., ¶ 11.

Significant also is evidence indicating that Payless did not simply accept the statements without review and consideration.  J. Berry & Company, for example, was retained by Payless in 2003 to audit lease expenses.  While specific objections were made by Berry for pass-through charges billed to Payless between 1997 and 2001 (DUF No. 73), Berry never mentioned or disputed use of the Revised Formula during this period.  Id. at No. 75.  Additionally, on or about August 17, 2004, Payless Lease Auditor Laurie Little West questioned the denominator used in calculating the 26.92 pro rata percentage utilized under the Revised Formula for pass-through charges.  See Ex. 16. In response, by correspondence dated September 27, 2004, Defendants explained how the Revised Formula was used for pass-through charges (Ex. 17), but received no further objection or correspondence from Payless concerning the calculation.

On April 3, 2007, Payless provided notice of its election to exercise its option to extend the Lease term though July 2012.  Payless's notice contained no request or demand that Defendant Trust utilize any formula other than the Revised Formula in allocating pass-through charges.  See Ex. 18; Joye Decl., ¶ 17.

Some six years later, after the interim reconciliation statements had been settled without objection, Payless representative Denise Evans wrote to Defendant Trust with the following query:

> I am processing the 2009 reconciliation and I notice that you are charging Payless a share equal to 26.92% which is using a denominator of approximately 13,299.  The lease states that the denominator was initially 114,679.  The lease states that you are to use the gross leasable area of all the completed buildings in the development.  Therefore, you should be using a denominator of all the square footage of all the completed buildings in the development.

Ex. 20.  In response, Diana Joye wrote Payless on the Trust's behalf on July 2, 2010, and again provided the basis for how the 26.92 percent figure used in the Revised Formula was calculated.  Ex. 21; see also DUF No. 96.  According to Diana Joye, she received no further response and the 2009 Reconciliation was thereafter settled by Payless.  Joye Decl., ¶ 19.  Perhaps even more importantly, in or about July 2010, Payless negotiated another extension of the Lease, though July 31, 2013.  It is undisputed that Payless' Lease Renewal Manager, Gayla Cowan, had the opportunity to clarify the proper formula in negotiating the Lease's continuation but failed to do so.  DUF Nos. 99-100.  Instead, Payless concedes that in connection with the 2010 extension it did not request or demand that Defendant Trust use any formula other than the Revised Formula in allocating pass-through charges.

On or about August 3, 2011, after obtaining an independent auditor to allegedly determine whether it had been overcharged, Payless gave Defendants notice of default under the lease.  Ex. J.  On August 24, 2011, Payless sent another notice outlining in specific detail the overcharges it identified.  Ex L.  Less than two months later, on October 19, 2011, Payless filed the present lawsuit in the United States District Court for the District of Kansas.  On or about February 28, 2012, the case was transferred to this District for adjudication.

///

///

///

///

///

9

1

2

**STANDARD**

3    The Federal Rules of Civil Procedure provide for summary judgment when "the

4 movant shows that there is no genuine dispute as to any material fact and the movant is

5 entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); <u>see also</u> Celotex Corp. v.

6 Catrett, 477 U.S. 317, 322 (1986).  One of the principal purposes of Rule 56 is to

7 dispose of factually unsupported claims or defenses.  <u>Celotex</u>, 477 U.S. at 325.

8    Rule 56 also allows a court to grant summary judgment on part of a claim or

9 defense, known as partial summary judgment.  <u>See</u> Fed. R. Civ. P. 56(a) ("A party may

10 move for summary judgment, identifying each claim or defense—or the part of each

11 claim or defense—on which summary judgment is sought."); <u>see also</u> Allstate Ins. Co. v.

12 Madan, 889 F. Supp. 374, 378-79 (C.D. Cal. 1995).  The standard that applies to a

13 motion for partial summary judgment is the same as that which applies to a motion for

14 summary judgment.  <u>See</u> Fed. R. Civ. P. 56(a); State of Cal. ex rel. Cal. Dep't of Toxic

15 Substances Control v. Campbell, 138 F.3d 772, 780 (9th Cir. 1998) (applying summary

16 judgment standard to motion for summary adjudication).

17    In a summary judgment motion, the moving party always bears the initial

18 responsibility of informing the court of the basis for the motion and identifying the

19 portions in the record "which it believes demonstrate the absence of a genuine issue of

20 material fact."  <u>Celotex</u>, 477 U.S. at 323.  If the moving party meets its initial

21 responsibility, the burden then shifts to the opposing party to establish that a genuine

22 issue as to any material fact actually does exist.  <u>Matsushita Elec. Indus. Co. v. Zenith</u>

23 <u>Radio Corp.</u>, 475 U.S. 574, 586-87 (1986); <u>First Nat'l Bank v. Cities Serv. Co.</u>, 391 U.S.

24 253, 288-89 (1968).

25 ///

26 ///

27 ///

28 ///

In attempting to establish the existence or non-existence of a genuine factual

dispute, the party must support its assertion by

> citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits[,] or declarations . . . or other materials; or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).  The opposing party must demonstrate that the fact in

contention is material, i.e., a fact that might affect the outcome of the suit under the

governing law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 251-52 (1986);

Owens v. Local No. 169, Assoc. of W. Pulp and Paper Workers, 971 F.2d 347, 355

(9th Cir. 1987).  The opposing party must also demonstrate that the dispute about a

material fact "is 'genuine,' that is, if the evidence is such that a reasonable jury could

return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248.  In other words,

the judge needs to answer the preliminary question before the evidence is left to the jury

of "not whether there is literally no evidence, but whether there is any upon which a jury

could properly proceed to find a verdict for the party producing it, upon whom the onus of

proof is imposed."  Anderson, 477 U.S. at 251 (quoting Improvement Co. v. Munson,

81 U.S. 442, 448 (1871)) (emphasis in original).  As the Supreme Court explained,

"[w]hen the moving party has carried its burden under Rule [56(a)], its opponent must do

more than simply show that there is some metaphysical doubt as to the material facts."

Matsushita, 475 U.S. at 586.  Therefore, "[w]here the record taken as a whole could not

lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for

trial.'"  Id. 87.

In resolving a summary judgment motion, the evidence of the opposing party is to

be believed, and all reasonable inferences that may be drawn from the facts placed

before the court must be drawn in favor of the opposing party.  Anderson, 477 U.S. at

255.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's

obligation to produce a factual predicate from which the inference may be drawn.

1  Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd,

2  810 F.2d 898 (9th Cir. 1987).

3

4  **ANALYSIS**

5

6  As indicated above, this case hinges on allegations that Defendants breached the

7  lease by overcharging for CAM, taxes and insurance through use of the Revised

8  Formula.  Secondarily, Plaintiff also claims that Defendants violated the so-called "Most

9  Favored Nation ("MFN") provision of the Lease, which provides that Payless shall not be

10  charged a greater pro rata share for CAM, taxes and insurance that any other tenant in

11  the development.  Lease, Ex. 2, § 20.05.  Finally, Payless alleges that Defendants

12  included documents in the CAM pool that were not permitted under the lease (Pl.'s

13  Compl., ¶ 50), and failed to provide Payless with documents relating to CAM, insurance,

14  and property taxes paid by other tenants in the Development.  Id. at 39-40.

15  In seeking redress for these alleged breaches, Payless states causes of action for

16  breach of contract and for declaratory relief.  In bringing this motion, as indicated above,

17  Defendants claim that Plaintiff's claims are barred not only by the terms of an Estoppel

18  Certificate executed by Payless in 1996, but also by virtue the ongoing course of

19  conduct in calculating and reconciling lease payments over a period of some 15 years.

20  Given that course of conduct, Defendant asserts that equitable defenses bar plaintiff's

21  claims herein, including the doctrines of estoppel and waiver.  Finally, with respect to the

22  MFN provision, Defendants claim there is no evidence that the Lease's terms in that

23  regard have been violated.

24  Payless' Opposition makes it clear that the crux of this matter rests whether the

25  Lease Formula governs the collection of CAM charges, taxes and insurance, or whether

26  the Revised Formula utilized by the parties since at least 1995, when Defendants

27  purchased the 1222 Building leased in part by Payless, is controlling.

28  ///

In the course of investigating this matter after Payless sent its notice of default by letter

dated August 3, 2011 (Ex. J), Payless conceded that Defendant Trust subsequently

provided additional information related to CAM tax and insurance charges to Payless,

and there is no contention that additional information in that regard needs to be

provided.  Significantly, too, with regard to taxes and insurance, Defendants note that

they do not have access to information held by other parcel owners in the Development

(Defs.' Mot., p. 9, n.8) and Payless does not challenge that contention.  Consequently, in

adjudicating this motion, the Court's focus must be on the propriety of the pass through

charges formulation utilized by Defendants for assessing CAM, taxes and insurance

since they bought the parcel leased by Plaintiff in 1995.  Secondarily, in determining

whether a breach of the Lease has incurred, the MFN provision has to be considered.


### A.  Estoppel Certificate


The starting point in the Court's analysis is the Estoppel Certificate executed by

Payless on December 10, 1996.  That Certificate, as discussed above, represented that

there were no outstanding breaches of Payless' Lease.  Significantly, Payless cannot

claim lack of knowledge with respect to the Revised Formula at the time it issued the

Estoppel Certificate since Defendants, in the course of the 1995 reconciliation earlier

that year, had already explained the basis for the Revised Formula.  Payless did not

dispute that explanation and approved the reconciliation statement for payment despite

its use of the Revised Formula.

An Estoppel Certificate like that issued by Payless is "a signed certification of

various matters with respect to a lease.  An estoppel certificate binds the signatory to the

statement made and estops that party from claiming to the contrary at a later time."

Plaza Freeway Ltd. Partnership v. First Mountain Bank, 81 Cal. App. 4th 616, 626.

(2000).  While Payless argues that the Estoppel Certificate should not be considered for

conduct extending past its December 1996 issuance, that assertion is misplaced.

1   "By their very nature, estoppel certificates look to the course of performance [and] the

2   signer is certifying the course of performance has not produced any defaults."

3   K's Merchandise Mart, Inc. v. Northgate Limited Partnership, 835 N.E.2d 965, 972

4   (Ill. App. 2005).  As Defendants note, prospective purchasers (in this case the Hartrick

5   Trust) rely upon such certificates to "ensure that they will not be exposed to a future

6   claim based upon a course of performance that existed prior to the purchase."  Defs.'

7   Reply, 3:22-24.  Here, because the course of conduct both before and after the Estoppel

8   Certificate was identical with respect to continuing application of the Revised Formula,

9   the Court believes that Payless is now precluded from asserting otherwise.

10

11          **B.  Equitable Defenses**

12

13          Any doubt as to the continued application of the Estoppel Certificate to the

14   dealings between Payless and Defendants after its issuance, and up to 2010 when the

15   present dispute arose, is dispelled by other evidence before the Court.  First, Payless

16   consistently paid the annual reconciliation statements as generated by Defendants at the

17   close of each Lease year.  As indicated above, those reconciliation statements, as well

18   as concurrently submitted budgets for the following leasehold year, all expressly apply

19   the Revised Formula.  The evidence shows that Payless never contested use of the

20   Revised Formula during the time the reconciliation statement/budgets were issued

21   between 1996 and 2010.  Second, in addition to the Revised Formula's unequivocal use

22   in the annual lease statements, on at least three additional occasions, in 1997, 2004 and

23   2010, respectively, Defendants expressly spelled out the mechanics of the Revised

24   Formula, again with no objection thereafter.  Significant too is the fact that in 2007, the

25   Payless lease was extended, and in 2010 it was renegotiated altogether.  In neither

26   instance was use of the Revised Formula challenged in any way.

27   ///

28   ///

14

1    Plaintiff's primary argument in attempting to dispel this lengthy course of dealing

2    is to assert that between 2007 and 2013, it operated between 3,600 and 4,500 Payless

3    stores, and therefore had to review pass-through charges claimed under 3,600 and

4    4,500 leases.  Given the fact it employed only six internal auditors during this period,

5    Payless argues that it "cannot examine the Pass Through Charges of any one of its

6    leases in great detail using internal resources."  See Pl.'s Opp'n, 7:20-8:7, citing

7    Torgersen Dep., 16:2-17:17; 42:21-43:3.

8    Any argument that Payless, a nationwide retailer, lacked sufficient resources to

9    adequately scrutinize its own business dealings is irrelevant for purposes of this motion.

10   The course of conduct between the parties, in the face of clear information provided on

11   numerous occasions about the Lease and its mechanics, is what matters. Moreover,

12   even when Payless did employ an outside lease auditor to scrutinize pass through

13   charges, as it did here in 2003 when J. Berry & Company was retained for that purpose,

14   Berry did not mention or dispute use of the Revised Formula.

15   Under the circumstances present, the Court believes that the equitable doctrines

16   of waiver and estoppel also apply to bar the present lawsuit.  Those defenses will now

17   be considered.

18

19   **1.  Waiver**

20

21   "Waiver is the intentional relinquishment of a known right after knowledge of the

22   facts."  Roesch v. DeMota, 24 Cal. 2d 563, 572 (1944).  It is well established under

23   California law, which applies in this diversity case, that "a party to a contract may by

24   conduct or representation waive the performance of a condition thereof, or be held

25   estopped by such conduct or representations to deny that he has waived such

26   performance."  Panno v. Russo, 82 Cal. App. 2d 408, 412 (1944).  Payments made in

27   contravention of a lease's terms may waive any alleged defect in the lease itself.  See,

28   e.g., Gould v. Corinthian Colleges, Inc., 192 Cal. App. 4th 1176, 1179-80 (2011).

1     Here, the long course of conduct between the parties shows unequivocally that

2  pass-through charges were assessed pursuant to the Revised Formula over a period of

3  some 15 years, and were paid without objection despite Payless' clear knowledge that

4  the Revised Formula was being used.  That knowledge was evidenced both by

5  reconciliation statements and proposed budgets submitted each year between 1996 (if

6  not earlier) and 2010, as well as by specific correspondence to Payless from Defendants

7  explaining the use of the Revised Formula on at least three occasions.   Although waiver

8  ordinarily involves questions of fact not amenable to disposition on summary judgment, a

9  case may be decided as a matter of law on the basis of either waiver or estoppel where

10  "only one inference may reasonably be drawn" from facts that are virtually undisputed.

11  Kennedy Milller Films PTY Ltd. v. Warner Bros., 1999 WL 985170 at *1 (9th Cir. 1999)

12  (citing Platt Pac. Inc. v. Andelson, 6 Cal.4th 307, 319 (1993).  Here, the use of the

13  Revised Formula between 1996 and 2010, as evidenced by both annual statements and

14  at least three specific explanations at the request of Payless, is undisputed, as is

15  Payless' failure to object to the use of the Revised Formula in response to the repeated

16  notice it received.  The only reasonable inference that can be drawn from that lengthy

17  course of conduct is Payless waived any objection to use of the Revised Formula.  The

18  doctrine of waiver squarely applies and precludes Payless from taking the position it now

19  advances.

20

21     **2.  Estoppel**

22

23     In addition to the express estoppel represented by the Estoppel Certificate

24  discussed above, equitable estoppel applies under California law as follows:

25         Whenever a party has, by his own statement or conduct,
       intentionally and deliberately led another to believe a
26       particular thing true and to act upon such belief, he is not, in
       any litigation arising out of such statement or conduct,
27       permitted to contradict it.

28  Cal. Evid. Code § 623.

16

1    Although this statutory formulation may suggest that equitable estoppel is limited

2    to instances involving fraud, case law does not apply estoppel so narrowly.  The doctrine

3    can be applied whenever one party's conduct induces a second party to detrimentally

4    alter its position before the inducing party then attempts to exploit the circumstances its

5    own conduct has created.  See, e.g., Hoopes v. Dolan, 168 Cal. App. 4th 146, 162

6    (2008).  Although estoppel, like waiver, is generally a question of fact, where the facts

7    are undisputed and only one reasonable conclusion can be drawn, the application of

8    estoppel becomes a matter of law.  Kennedy Milller Films PTY Ltd. v. Warner Bros.,

9    1999 WL 985170 at *1; Feduniak v. Cal. Coastal Comm'n, 148 Cal. App. 4th 1346, 1360

10   (2007).

11   Here, by failing to object to use of a formula applied over a course of many years,

12   despite numerous opportunities to do so, this Court concludes that the doctrine of

13   equitable estoppel, in addition to waiver, applies.  The same conclusion was reached

14   under similar facts by a New York case in In re Rockefeller Center Properties, 272 B.R.

15   524 (S.D.N.Y. 2000)   In Rockefeller, the district court examined a reconciliation

16   provision under a commercial lease, and held that the tenant's claims for alleged

17   overcharges were barred because of the tenant's failure to timely object to the claimed

18   charges.  The lease at issue in Rockefeller, like this one, called for the payment of

19   additional rent for CAM and other pass-through charges following an annual statement

20   reflecting those charges.   Id. at 532.  Also similar to this case was the lease's

21   requirement that final reconciliation occur "promptly" following the provision of that

22   statement.  Between 1989 and 1992, the leaseholder in Rockefeller paid the amount due

23   under the annual statement, without objection.  Then, after receiving the 1993 annual

24   statement, the tenant objected and withheld amounts due under the lease.  Id. at 535.

25   The district court granted summary judgment in favor of the owner (who had become the

26   debtor under pending bankruptcy proceedings) under the doctrines of both estoppel and

27   waiver, as well as similar defenses premised on the account stated and voluntary

28   payment doctrines.

1    The Rockefeller court applied estoppel to bar the tenant's claims for overcharges

2    for which it failed to object, reasoning that estoppel applies if the tenant, by "its failure to

3    object or inquire within a reasonable time places the [owner] in a worse position than if

4    timely protest or inquiry had been made." Id. at 551.  Citing the fact that the monies paid

5    without objection were already spent and incorporated into future revenue and expense

6    projections, as well as the fact that properly analyzing such payments necessarily fades

7    with the passage of time, Rockefeller found the requisite prejudice to be present.

8    Similarly, Defendants here represent that they relied extensively on the reconciliation

9    provisions of the Lease, as well as the annual reconciliation process, because it allowed

10   the Trust to move forward each Lease year in budgeting for further expenses and

11   revenue projections, without any potential lingering liabilities emanating from the prior

12   Lease year.  Joye Decl., ¶ 12.

13   Although not precedential authority, this Court is nonetheless persuaded by the

14   logic of the Rockefeller court, particularly given the striking similarity of the facts

15   analyzed there to the circumstances of the present matter.  Although decided under

16   New York law, Defendants have represented that the legal doctrine of estoppel is nearly

17   identical in California, and Plaintiff has offered no authority contending otherwise.

18   Payless tries to distinguish Rockefeller primarily on grounds that it dealt with one

19   lease, as opposed to the 3,600 to 4,200 leases managed by Payless.  The Court has

20   already found this distinction unpersuasive.  Second, Payless argues that because the

21   Rockefeller lease limited any right to perform a lease audit within six months of the year

22   end reconciliation statement (which the lease in Rockefeller denominated as an

23   "escalation" statement), that distinguishes the case from the present matter which

24   contained no such audit requirement.  Again, the Court does not view the distinction

25   Payless advances as persuasive.  Both the Rockefeller lease and the present

26   agreement called for the pass-through charges to be reconciled on a "prompt" basis, and

27   the fact that Rockefeller had an additional provision with respect to initiating an audit

28   does not make any material difference.

18

In sum, then, Payless' breach of contract claim with regard to allocation of pass-through charges fails because the claim is barred on both waiver and estoppel grounds.

### C.  "Most Favored Nation" Clause

The Lease at issue herein contains a so-called Most Favored Nation ("MFN") provision which provides as follows:  "Tenant shall pay no greater pro rata share of the charges for taxes, insurance and Common Area maintenance provided for in any section of this Lease than that paid by any other tenant in the Development."  Lease, Ex. 2, § 20.05.

In addition to taking issue with the Revised Formula for computing pass-through charges in the first place, Payless also argues that the charges it incurred violated the Lease's MFN clause.  The Court rejects this argument on several levels.  First, as indicated earlier in this Memorandum and Order, the use of the Revised Formula actually resulted in a slightly lower charge than the Lease Formula itself would have provided (3.068 percent v. 3.12 percent).  Secondly, with respect to taxes and insurance, the fact that the Development split into separate parcels beginning in 1994 means that it would have been all but impossible to compare taxes and insurance obtained by different owners under different circumstances.  Even aside from that critical distinction, however, the fact remains that the MFN clause requires only that Payless' "pro rata" charges be no more than other tenants.  Pro rata is defined by Black's Law Dictionary as meaning "proportionately; according to an exact rate, measure, or interest."  Black's Law Dictionary 1257 (8th ed. 2004).  Consequently, the hallmark of a pro rata share lies with its proportionality rather than any exact dollar figure.  As Defendants point out, this means that two tenants, even if they have the same proportionate share of pass-through charges, may pay different amounts if the expenses for their respective parcels vary.

///

///

1    Defendants move for summary judgment as to Payless' breach of contract cause

2    of action, to the extent it is premised on the MFN clause, on grounds that Payless'

3    discovery responses reveal "it has no evidence whatsoever than any specific tenant

4    within the Development enjoys a more favorable 'pro rata' share than Payless when it

5    comes to Pass-Through Charges."  As Defendants point out, a party moving for

6    summary judgment may carry its initial burden on summary judgment by showing that

7    the opposing counsel lacks sufficient evidence to carry its ultimate burden of persuasion

8    at trial; namely, that has no evidence from which a jury could find an essential element of

9    the opposing party's claim.  Fed R. Civ. P. 56(c)(1)(B); Celotex Corp. v. Catrett, 477 U.S.

10   at 325.

11   Plaintiff counters this contention by pointing to the Affidavit of Michael Donahue, a

12   Certified Public Accountant who analyzed the charges incurred by Payless for CAM,

13   taxes and insurance in conjunction with "some" of the other tenants in the Development

14   for lease years 2006-11.  Tellingly, all the Donahue Declaration concludes is that one

15   tenant, Save Mart, paid the lowest CAM and real estate taxes per square foot  during

16   this period and that another tenant, Big 5 Sporting Goods, paid the lowest insurance per

17   square foot during the same time.   Donahue Decl., Ex. K, ¶¶ 11-12.

18   Nowhere in the Donahue Declaration is the operative "pro rata" term even

19   mentioned.  The fact that other tenants may have paid lower pass-through charges is of

20   no moment, since the same pro rata proportion could apply with different expenses to

21   create a different cost per square foot.   Mr. Donahue's failure to use the term "pro rata"

22   is revealing since that is the term used in the Lease itself.  As Defendants point out, one

23   has to assume he would have used the concept had he been able to do so.  The

24   Donahue declaration as submitted fails to defeat Defendants' Motion.

25   ///

26   ///

27   ///

28   ///

1

2

### D.  Declaratory Judgment Claim

3      Having determined that Plaintiff's breach of contract claim, whether under a pass-

4   through analysis or through reliance on the Lease's MFN clause, fails as a matter of law,

5   the only remaining claim is Plaintiff's Second Cause of Action, for Declaratory Judgment.

6   That claim for declaratory relief, however, does nothing more than request relief under

7   the same MFN clause that is already the subject of Plaintiff's Breach of Contract Claim.

8   As such, Defendant argues that the Second Cause of Action is barred on grounds that it

9   is duplicative of the breach of contract claims.

10      In bringing this Motion, Defendants cite authority to the effect that this Court may

11   decline to exercise its discretion to hear claims for declaratory relief when such

12   duplication is present.  See Akhavein v. Argent Mortg., 2009 WL 2157522  at *5 (N.D.

13   Cal. 2009) (where the relief plaintiff seeks is commensurate with the relief sought

14   through other causes of action, the declaratory relief claim is duplicative and

15   unnecessary); Camillo v. Washington Mut. Bank F.A., 2009 WL 3614793 at *13 (E.D.

16   Cal. 2009) (dismissing plaintiff's claim for declaratory relief as "redundant" of other

17   claims alleged and therefore "unnecessary").

18      Plaintiff's Opposition makes no attempt to question this authority and makes no

19   argument that its declaratory judgment claim can survive independent of the breach of

20   claim already addressed above.  Defendants are therefore also entitled to summary

21   judgment as to Plaintiff's Second Claim.

22   ///

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

**CONCLUSION**

Given the foregoing, Defendants' Motion for Summary Judgment (ECF No. 35) is GRANTED.[3]  Judgment shall accordingly be entered in favor of Defendants.  Because this matter has been decided solely by reference to the affirmative defenses set forth in Defendants' initial answer of March 12, 2012, Plaintiff's Motion for Leave to File Amended Answer (ECF No. 36), which seeks to assert additional affirmative defenses, is DENIED as moot.

The Clerk of Court is directed to close the file.

IT IS SO ORDERED.

Dated:  February 4, 2014

_____

MORRISON C. ENGLAND, JR, CHIEF JUDGE
UNITED STATES DISTRICT COURT

---

[3] Because oral argument was not of material assistance, the Court ordered this matter submitted on the briefs.  E.D. Cal. Local Rule 230(g).